**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| TAMMY WARD, | * |
| Plaintiff, | * |
| | * |
| v. | * |
| | *      Civil No. 24-0685-BAH |
| INTERNATIONAL BUSINESS | * |
| MACHINES CORPORATION, | * |
| Defendant. | * |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**MEMORANDUM OPINION**

Plaintiff Tammy Ward brought suit against International Business Machines Corporation ("IBM") alleging multiple claims, including breach of contract, unjust enrichment, and violation of the Maryland Wage Payment and Collection Law. ECF 19 (Amended Complaint). Pending before the Court is Defendant's motion to dismiss (the "Motion") several of Plaintiff's claims. ECF 20. Plaintiff filed an opposition, ECF 21, and Defendant filed a reply, ECF 22. All filings include memoranda of law, while the complaint and the Motion include exhibits.[1] The Court has reviewed all relevant filings and finds that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2023). Accordingly, for the reasons stated below, the Motion is **DENIED**.

## I.    BACKGROUND

### A.  Scope of Plaintiff's Employment with Defendant

Plaintiff was originally employed by IBM from 1982 until 2014. ECF 19, at 1 ¶ 1. In August 2019, Plaintiff was rehired as a senior sales specialist in the Technology Lifecycle Services

---

[1] The Court references all filings by their respective ECF numbers and page numbers by the ECF-generated page numbers at the top of the page.

("Services") department.[2]  *Id.* ¶ 2.  She reports that she received consistently positive performance evaluations as well as numerous company awards throughout her time working for IBM.  *Id.* at 2 ¶¶ 4–10.

While employed as a senior Services sales specialist, Plaintiff reported directly to sales manager Ross Biello ("Biello") and Biello reported to Adam Lawrence ("Lawrence"), General Manager of IBM's Financial Services Market.  ECF 19, at 3 ¶¶ 15–16.  Plaintiff alleges that Linda York ("York"), Vice President of the company's Services department for the Americas, was Biello's "dotted line," which means that Biello "receive[d] work assignments from and sen[t] completed work to [ ] York."  *Id.* at ¶ 17.  In 2023, York assumed the role of Vice President of IBM's Worldwide Services Sales, replacing the previous holder Yasser Eissa, who remained Vice President during the times relevant to the case at hand.  *Id.* ¶¶ 18–19.

For her work as a sales specialist, Plaintiff was compensated by a base salary as well as commission earnings.  ECF 19, at 3 ¶ 20.  Every six months, IBM provided Plaintiff with an "Incentive Plan Letter" ("Incentive Plan") that detailed her compensation plan for the first and second half of each year.  *Id.*  Each Incentive Plan incorporated particular quota amounts, including for primary contracts values and secondary revenue, and calculated Plaintiff's commission payment accordingly.  *Id.* at 3–4 ¶¶ 22–25.  Plaintiff avers that none of the Incentive Plans applied to any other compensation program offered by IBM.  *Id.* at 4–5 ¶¶ 26–27.

In her role as a sales specialist for the Services department, Plaintiff handled transactions "valued at less than $25 million in Maintenance Contract Value."  ECF 19, at 5 ¶ 28.  She did not typically work on deals valued over $25 million, nor did IBM require (even or permit) her to.  *Id.*

---

[2] Plaintiff indicates that this department was called "TSS" prior to being renamed in July 2022. ECF 19, at 2 ¶ 3.

¶¶ 31–32.  Instead, where Plaintiff qualified deals above $25 million in value, the Service Department transferred the sales opportunity to a "Complex Solution Executive" and Plaintiff was not compensated for such deals.  *Id.* ¶ 33.  Plaintiff avers that a contract's value is calculated based "on the first three years of a contract."  *Id.* ¶ 34.  When Plaintiff closed on the sub-$25 million contracts that came within the remit of her position, the contract was registered in a database and Plaintiff thereafter received payment on that contract "without any need for prior approval" from IBM.  *Id.* ¶¶ 35–36.

### B. Factual Allegations

Plaintiff's claims stem from two deals she worked on in 2021 and 2022.  ECF 19, at 7 ¶ 44.

#### 1.    ADP Red Hat Deal

In January 2021, Plaintiff "was assigned to the ADP Red Hat deal" ("Red Hat deal").  ECF 19, at 7 ¶ 45.  In the course of early working sessions, executives from ADP asked that the closure of the deal be postponed from the fourth quarter of 2021 to the first quarter of 2022.  *Id.* at ¶¶ 47–50.

On January 12, 2022, Plaintiff and other sales specialists in the Service Department received a notification from IBM informing them of a new incentive plan (the "Q1 Incentive") aimed at bringing pending deals to closure.  ECF 19, at 8 ¶ 53.  The terms of the Q1 Incentive envisioned that sellers working on existing deals could transfer the lead role on those deals to new sellers and "continue to assist the new seller on the transferred deal, in exchange for receiving a portion of the commission they would have earned if they had remained [lead] on the deal."  *Id.* ¶¶ 53–54.  Plaintiff stresses that the Q1 Incentive notification announcement did not refer to, incorporate, or use the language of the terms and conditions of any Incentive Plan she had previously received, nor did it reserve any discretionary right of amendment to IBM.  *Id.* at 8–9 ¶¶

3

55–64. She further avers that Defendant continues to have "custody and control of all documents concerning" the Q1 Incentive plan. *Id.* at 9 ¶ 65.

Pursuant to the Q1 Incentive, Plaintiff agreed to transfer the lead role on the Red Hat deal to another seller, Ed Weilage. ECF 19, at 9 ¶ 72. She attests that she agreed to take up the offered Q1 Incentive because she understood that "she would be compensated" for the extra work performed under the terms of the program. *Id.* ¶¶ 68, 71. After the Red Hat deal was transferred, Plaintiff continued to assist in completing it even though she was no longer leading the effort to do so. *Id.* at 10 ¶ 77. Plaintiff notes that "[w]orking on deals that were assigned to other sellers was not something [she] was normally required to do" in her role as a sales specialist but reiterates that she did so because she believed she would be compensated for her assistance under the terms of the Q1 Incentive. *Id.* ¶¶ 78–79. Plaintiff was still listed as a member of the team working on the Red Hat deal as of March 11, 2022. *Id.* ¶ 80.

The Red Hat contract was executed on March 30, 2022 in the amount of $6.2 million. ECF 19, at 11 ¶ 82. Because the deal was closed within the first quarter of 2022, Plaintiff argues, she was entitled to "a portion of the commission that she would have earned if she had remained the seller on that [ ] contract" pursuant to the Q1 Incentive. *Id.* ¶ 83. However, despite receiving recognition as a member of the team that brought the deal to completion, *see id.* at 11–12 ¶¶ 85–86, Plaintiff did not receive the promised commission payment, *see id.* at 14 ¶ 97.

### 2.   JPMorgan Chase Deal

On July 1, 2021, Plaintiff was assigned to cover IBM's account with JPMorgan Chase ("JPMorgan"). ECF 19, at 19 ¶ 134. The previous sales team covering the account had lost a substantial contract with JPMorgan and Plaintiff indicates that she received the assignment in order to "turn around the account" for the company. *Id.* ¶ 135–36. Plaintiff notes that she successfully

4

repaired IBM's relationship with JPMorgan and secured a one-year technology support contract effective October 1, 2021. *Id.* at 20 ¶ 142. This contract was valued at over $19 million. *Id.*

In the second quarter of 2022, Plaintiff "initiated conversation" with JPMorgan for "the upcoming one-year renewal" option for the technology services contract. ECF 19, at 20 ¶ 143. As a one-year option, the contract renewal would have been valued at nearly $15 million, a figure within Plaintiff's usual compensation plan "for deals valued at less than $25 million[.]" *Id.* ¶ 145. Plaintiff attests that if she had pursued this one-year renewal option, she would have hit over 600% of her target achievement and "automatically" received a commission of more than $200,000. *Id.* ¶ 146.

Around the same time, in March 2022, executives in the Services department announced a "special incentive program" (the "Special Incentive") aimed at incentivizing certain sales specialists to execute contracts valued at over $25 million. ECF 19, at 15 ¶ 98. This opportunity extended to those sales associates, including Plaintiff, who typically worked on deals lower than $25 million. *Id.* Plaintiff attests that the Special Incentive plan announcement did not refer to or incorporate any of the terms of her usual Incentive Plan letters, nor did the governing document of the Special Incentive plan. *Id.* at 15–16 ¶¶ 99–114. Moreover, Plaintiff stresses, the announcements "did not contain any language reserving Defendant the discretion, or right, to change or amend the terms" of the plan but instead proclaimed to sellers, "[i]f you close it, you will be compensated." *Id.* at 18 ¶¶ 126, 129. The Special Incentive governing document likewise did not include discretionary language. *Id.* ¶ 132.

After the Special Incentive plan was announced, Plaintiff "saw the potential for increased commissions and an extended term commitment" for JPMorgan's contract. ECF 19, at 20 ¶ 147. As the Special Incentive plan had provided her with the authorization to close deals valued at over

$25 million, Plaintiff began attempting to secure a longer, higher value contract option with JPMorgan. *Id.* ¶ 148. Under the terms of the Special Incentive, Plaintiff attests, a seller's managers were responsible for ensuring that the seller was authorized to receive commission payment for closing a deal over $25 million; Plaintiff notes that Biello and York ensured that she had "proper approval." *Id.* at 17 ¶¶ 119–21, 21–22 ¶¶ 153–66.

On September 27, 2022, Plaintiff received an order from JPMorgan committing to purchasing a minimum of $35,302,744 in IBM products over a three-year period. ECF 19, at 23–24 ¶¶ 171–72. Plaintiff indicates that the final value of the contract with JPMorgan amounted to over $42 million. *Id.* at 25 ¶ 177. She reports that she continued to work on closing the deal with JPMorgan because York had repeatedly told her that she had been nominated for a commission payment on the deal under the terms of the Special Incentive plan. *Id.* ¶¶ 178–79. According to Plaintiff, "Defendant never told [her] that she wasn't nominated for attainment during the progression and execution" of the deal in the third quarter of 2022 and "never told [her] that she wasn't eligible for payment for the first $25 million in attainment on the deal." *Id.* ¶¶ 181–82.

Although Plaintiff's managers had nominated her for Special Incentive plan compensation on the JPMorgan deal and had provided the required evidence, she alleges she received only $35,580 in commission payment but avers that she should have received $345,409.46. ECF 19, at 26–27 ¶¶ 185–87, 29 ¶ 196. In January 2023, Plaintiff reached out to Biello to express her concern that she had not yet been paid in accordance with the terms of the Special Incentive plan. *Id.* at 29 ¶ 199. Biello in turn raised the issue with York, who responded that she would speak to the incentive payment office the following week. *Id.* at 30 ¶¶ 200–02. However, Plaintiff still did not receive payment. *Id.* at 31 ¶ 203. Plaintiff attests that she "satisfied all of the requirements for payment" on the JPMorgan deal pursuant to the Special Incentive plan, that both Biello and York

6

"repeatedly told [Plaintiff] that she was nominated for payment" on the deal, and that Defendant never indicated anything to the contrary. *Id.* at 36 ¶¶ 209–13. She notes that other, similarly situated sellers who did not pursue a closing under the Special Incentive plan earned more in commission despite continuing to work solely on deals valued at under $25 million. *Id.* at 37 ¶ 218. Plaintiff estimates that, had she closed the JPMorgan deal as a one-year contract, she would have earned at least $230,194.29 in automatic commission payment according to the formula articulated in her Incentive Plan. *Id.* ¶ 217.

Plaintiff brings nine counts against Defendant: owed wages under the Maryland Wage Payment and Collection Law ("MWPCL") (Count I); unjust enrichment on the Red Hat deal (Count II); unjust enrichment on the JPMorgan deal (Count III); breach of contract under the Q1 Incentive (Count IV); breach of contract under the Special Incentive (Count V); breach of implied-in-fact contract/quantum meruit under the Q1 Incentive (Count VI); breach of implied-in-fact contract/quantum meruit under the Special Incentive (Count VII); promissory estoppel under the Q1 Incentive (Count VIII); and promissory estoppel under the Special Incentive (Count IX). ECF 19, at 38–56 ¶¶ 230–400. Defendant seeks to dismiss only Counts I, III, V, VII, and IX. ECF 20-1, at 1.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) governs dismissals for failure to "state a claim upon which relief can be granted." In considering a motion under this rule, courts discount legal conclusions stated in the complaint and "accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A court then draws all reasonable inferences in favor of the plaintiff and considers whether the complaint states a plausible claim for relief on its face. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009). "A claim has facial

7

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

"The complaint must offer 'more than labels and conclusions' or 'a formulaic recitation of the elements of a cause of action[.]'" *Swaso v. Onslow Cnty. Bd. of Educ.*, 698 F. App'x 745, 747 (4th Cir. 2017) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). At the same time, a "complaint will not be dismissed as long as [it] provides sufficient detail about [the plaintiff's] claim to show that [the plaintiff] has a more-than-conceivable chance of success on the merits." *Owens v. Balt. City State's Att'ys Off.*, 767 F.3d 379, 396 (4th Cir. 2014).

The Court may consider "documents attached to the complaint, 'as well as those attached to the motion to dismiss, so long as they are integral to the complaint and authentic.'" *Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019) (quoting *Philips v. Pitt Cnty. Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)). A document is "integral" when "its 'very existence, and not the mere information it contains, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F.Supp.2d 602, 611 (D. Md. 2011) (citation omitted) (emphasis omitted).

## III.    ANALYSIS

### A. Count I – MWPCL

Plaintiff brings Count I against Defendant pursuant to the MWPCL. She argues that Defendant has violated the MWPCL by failing to pay her the "earned and accrued commission payments and wages from the completion of the [ ] Red Hat and [JPMorgan] contracts in 2022." ECF 19, at 38 ¶ 232. Defendant counters that Plaintiff's MWPCL claim is foreclosed by the Fourth Circuit's unpublished, per curiam decision in *Martignetti v. Int'l Bus. Mach. Corp.*, 855 F. App'x 857 (4th Cir. 2021). Defendant reads *Martignetti* as standing for the proposition that "an employee cannot assert a claim under the MWPCL for allegedly unpaid bonuses or commissions absent a

8

showing that the employer 'promised' the bonuses or commission to the employee." ECF 20-1, at 7 (citing *Martignetti*, 855 F. App'x at 861). Defendant represents that, like in *Martignetti*, Plaintiff's Incentive Plan expressly reserved to IBM the "sole discretion to review and adjust her commission plan and payment" and such discretionary language "forecloses the existence of any promise between the parties requiring the payment of additional commissions." *Id.* at 8.

The MWPCL "is a statutory cause of action, the purpose of which is to provide a vehicle for employees to collect, and an incentive for employers to pay, back wages." *Cunningham v. Feinberg*, 107 A.3d 1194, 1202 (Md. 2015). It requires that "[e]ach employer shall pay an employee . . . all wages due for work that the employee performed before the termination of employment, on or before the day on which the employee would have been paid the wages if the employment had not been terminated." Md. Code Ann., Lab. & Emp. § 3-505(a). The MWPCL defines "wage" as "all compensation that is due to an employee for employment," which can include "a commission." Md. Code Ann., Lab. & Emp. § 3-501(c)(1)–(2); *see also Macsherry v. Sparrows Point, LLC*, 973 F.3d 212, 226 n.9 (4th Cir. 2020). For a commission to count as a "wage," however, "the employee must have been promised the particular form of compensation as remuneration for his labor." *Varghese v. Honeywell Int'l Inc.*, 424 F.3d 411, 418 (4th Cir. 2005).

While Defendant is correct on in making the point that, in general, *Martignetti* recognized that an employee must have been specifically promised certain compensation, the Court is not persuaded that Plaintiff did not receive such a promise here. Plaintiff does not argue that she was promised a commission according to the terms of her Incentive Plan. Instead, she claims payment for commissions owed pursuant to the Q1 Incentive and the Special Incentive plan and expressly disclaims that either program referenced or incorporated the terms of her Incentive Plan. *See* ECF

19, at 8–9 ¶¶ 55–64, 16 ¶¶ 108–114. Defendant counters that the "plain language" of the Incentive

Plan "makes clear" that IBM's overall compensation plan "includes both the information in the

[Incentive Plan letter], as well as the 'information contained on the IBM Worldwide Incentives

Workplace,' which is where the information on the [Special Incentive] was located."[3]  ECF 20-1,

at 8 (quoting ECF 20-3, at 78 (Plaintiff's Incentive Plan for the first half of 2022)).  Defendant

reads this clause in the Incentive Plan as prospectively applying the terms and conditions of the

Incentive Plan to the Special Incentive plan.

Maryland courts "follow the objective theory of contract interpretation." *ACAS, LLC v.*

*Charter Oak Fire Ins. Co.*, 626 F. Supp. 3d 866, 874 (D. Md. 2022) (citing *O'Brien & Gere*

*Engineers, Inc. v. City of Salisbury*, 135 A.3d 473, 489 (Md. 2016)).  "If a contract is unambiguous,

the court must give effect to its plain meaning and not contemplate what the parties may have

subjectively intended by certain terms at the time of formulation." *Nova Research, Inc. v. Penske*

*Truck Leasing Co.*, 952 A.2d 275, 283 (Md. 2007) (internal citation omitted).  "A contract is

ambiguous if, when read by a reasonably prudent person, it is susceptible to more than one

meaning." *Id.*  Here, the plain language of the Incentive Plan does not clearly encompass other

compensation programs merely by virtue of their location on the same internal web page.[4]  Indeed,

---

[3] As stated above, the Court may at this stage consider documents attached to the complaint or the motion to dismiss so long as they are integral to the complaint.  "Generally, a contract is integral in a breach of contract action." *District of Columbia Water & Sewer Auth. v. Samaha Associates, PC*, 729 F. Supp. 3d 511, 517 (D. Md. 2024).  Accordingly, the Court will consider the Incentive Plan agreement and the Special Incentive agreement as integral to the claims at issue here.  Neither Defendant nor Plaintiff have produced the agreement for the Q1 Incentive plan, and Plaintiff notes that this document is in Defendant's sole "custody and control[.]" ECF 19, at 9 ¶ 65.  Defendant does not seek to dismiss Plaintiff's claims related to the Red Hat deal undertaken pursuant to the Q1 Incentive plan.

[4] The IBM Worldwide Incentives Workplace appears to be a webpage, and the Incentive Plan provides the access URL. *See* ECF 20-3, at 78.  The Court therefore infers that the Workplace is a site that hosts the information about the Incentive Plan and other IBM policies.

10

the portion of the Incentive Plan compensation contract that Defendant cites to is not so clear but says in full only that "[t]he Incentive Plan information contained on the IBM Worldwide Incentives Workplace plus the information in this Incentive Plan Letter is referred to as the 'Plan.'" ECF 20-3, at 78. This clause appears under the "General Information" portion of the contract and makes no mention of applying the terms of the Incentive Plan to other forms of commission compensation. The Court cannot say that a reasonably prudent person would contemplate that the bare description offered would clearly signal that the Incentive Plan's discretionary clause extends to other commission schemes offered by IBM. Nor can the Court determine that the same reasonably prudent person would read the Incentive Plan's language that "[w]ithout an accepted Incentive Plan Letter," a seller is "not eligible to receive any incentive payments" and conclude that this clause applied to special commission programs outside the routine base compensation arrangement governed by the Incentive Plan. ECF 20-3, at 79. A plain reading of this language therefore appears to condition only payments arising under the Incentive Plan letter. Moreover, though the letter references "any" incentive payment, a plain reading of this clause within the entirety of the agreement reinforces that only the commission payments governed by the Incentive Plan are at issue. *See Dumbarton Improvement Ass'n v. Druid Ridge Cemetery Co.*, 73 A.3d 224, 232–33 (Md. 2013) (emphasizing that Maryland principles of contract interpretation require courts to construe a contract "in its entirety").

Defendant next argues that the terms of the Special Incentive plan itself establish that the plan was discretionary, and that Plaintiff can therefore not recover on her MWPCL claim for commission payment under the JPMorgan deal. ECF 20-1, at 9. Defendant points to the procedure by which a seller's manager needed to submit the seller for commission payment approval and asserts that such a process clearly indicates discretion on the part of IBM. *Id.* (citing 20-2, at 3

(the Special Incentive plan)). Because payment under the Special Incentive plan was subject to approval and therefore not dependent solely on Plaintiff's efforts, Defendant argues, Plaintiff cannot recover under the MWPCL. Plaintiff responds that "Defendant's own announcements" regarding the Special Incentive plan "explicitly state that 'any eligible seller with a L25 sales plan who closes a deal with value greater than $25m **will be paid** for closing **the full value of the deal.**'" ECF 21, at 12 (quoting ECF 19, at 17 ¶ 124) (emphasis in ECF 21).

Generally, a plaintiff who is party to a written contract "cannot reasonably believe in the full truth of an alleged misrepresentation that directly contradicts the terms of a contract" they signed. *Meerkreebs v. Astor & Sanders Corp.*, Civ. No. PWG-17-695, 2018 WL 1211539, at *5 (D. Md. Mar. 7, 2018) (internal quotation omitted). "Put another way, a plaintiff cannot justifiably rely on [a] [ ] pre-contractual statement if the subsequent written agreement contradicts the statement." *Lehner v. ProSource Consulting LLC*, Civ. No. GLR-18-858, 2018 WL 6395539, at *9 (D. Md. Dec. 6, 2018). Here, however, the oral representation that a seller closing deals above $25 million "will be paid" does not contradict an express term of the Special Incentive plan description. The plan document only sets out the process by which the seller is considered for eligibility to work on deals valued at greater than $25 million and the need for the seller's manager to "approve payment." ECF 20-2, at 3. Plainly stated, this is not the language that the Fourth Circuit considered in *Martignetti*.

The *Martignetti* court determined that the "plain language" of the compensation plan at issue there, essentially a plan similar to Plaintiff's Incentive Plan, "repeatedly and unreservedly stated that IBM could adjust the amount of any commission at its sole discretion." *Martignetti*, 855 F. App'x at 861. No such unambiguous discretionary language is at issue here with respect to the Special Incentive plan. Moreover, Defendant does not point the Court to any Maryland

12

precedent supporting Defendant's argument that an employer has complete discretion over commission payments, and thus operates outside of the remit of the MWPCL, simply because the employer's approval to distribute a bonus or commission is required at some stage of the process.[5] As Plaintiff notes, ECF 21, at 12–13, some commission-based compensation plans require managerial oversight, even approval, but nonetheless fall under the auspices of the MWPCL. *See Moon v. Veritas Techs., LLC*, Civ. No. GJH-21-2750, 2022 WL 3348103, at *5 (D. Md. Aug. 12, 2022) (finding that a commission-based compensation system that required an employee to "receive approval from the Compensation Exception Committee" nonetheless constituted a "wage" under the MWPCL).[6] The Court therefore determines that the language of the Special

---

[5] Defendant does briefly reference *Medex v. McCabe*, 811 A.2d 297 (Md. 2002) as supporting its position, ECF 20-1, at 9, but the Court reads *Medex* differently. Indeed, the holding in *Medex* would appear to suggest the opposite of what Defendant argues, as the *Medex* court determined that where a plaintiff has "performed all the work necessary to earn the [incentive] fees," such fees should be considered "compensation for work performed, and, thus, wages under the [MWPCL]." *Medex*, 811 A.2d at 303. *Medex* also rejected the premise that an employer could insert contractual language to "eliminate" the public policy set forth in the MWPCL that "employees have a right to be compensated for their efforts." *Id.* at 304. Here, to compare, Plaintiff has expressly alleged that she "satisfied all of the requirements for payment on the [JPMorgan] deal," including receiving the approval from her manager, and thus has a right to receive compensation for her work. ECF 19, at 36 ¶ 209.

[6] Other District of Maryland cases cited by Defendant do not compel a different result. *See* ECF 20-1, at 7–8; ECF 22, at 4 (citing *Ridgell v. Hartford Fire Ins. Co.*, Civ. No. DLB-23-1236, 2024 WL 555137 (D. Md. Feb. 12, 2024) and *Lanasa v. AstraZeneca Pharms. LP*, Civ. No. DLB-22-1399, 2023 WL 2527209 (D. Md. Mar. 15, 2023)). The bonus program at issue in *Ridgell* gave "complete discretion over whether and how much to award" to management. *Ridgell*, 2024 WL 555137 at * 3. Indeed, the plaintiff in *Ridgell*, unlike Ward, did "not even allege that the amount of the bonus was nondiscretionary" or "a function of her performance alone," thus making the compensation program at issue there more akin to the one reviewed in *Martignetti*. *Id.* (citing *Martignetti*, 855 F. App'x at 861). Similarly, the incentive program at issue in *Lanasa* reserved to the employer "sole and unfettered discretion to determine whether and how much to award an employee." *Lanasa*, 2023 WL 2527209, at *5. Plaintiff does not allege that Defendant had as much discretion here; indeed, the Special Incentive plan itself notes that a "nomination" merely "serve[s] as identification that the seller was involved and instrumental in the signing," ECF 20-2, at 4, not that the nomination process gave complete discretion to determine the amount and timing of the award, as was the case in both *Lanasa* and *Ridgell*.

Incentive plan not only fails to directly contradict the alleged extra-contractual statement, "you will be paid," but also does not seem to evince any discretionary language that would disqualify the commission payment as a wage. Accordingly, the Court will not dismiss Plaintiff's MWPCL claim.

## B. Count V – Breach of Contract Under the Special Incentive Plan

To state a claim for breach of contract under Maryland law, a plaintiff must allege facts sufficient to indicate (1) that defendant owed plaintiff a contractual obligation and (2) that defendant breached such an obligation. *RRC Ne., LLC v. BAA Maryland, Inc.*, 994 A.2d 430, 440 (Md. 2010) (citing *Continental Masonry Co., Inc. v. Verdel Constr. Co., Inc.*, 369 A.2d 566, 569 (1977)).

Defendant argues that the express terms of the Special Incentive plan foreclose Plaintiff's ability to recover for breach of contract. It points again to the contractual language regarding the process for a seller to obtain approval and contends that because Plaintiff failed to receive such approval, she may not bring a claim for breach of contract.[7] Specifically, Defendant references the portion of the Special Incentive letter that notes a seller "had to submit a request for approval" to the vice president of the department and argues that because Plaintiff "does not allege that she made any such request," Defendant "owed no obligation to her." ECF 20-1, at 12. Because, Defendant contends, Plaintiff failed to plead that she received approval from the vice president, so Defendant could not have breached the terms of the Special Incentive agreement. *Id.* at 13. Plaintiff responds that the Special Incentive plan clearly made it the responsibility of her managers

---

[7] Defendant also points to the discretionary language in the Incentive Plan and argues that because there was no obligation to pay, the Special Incentive plan did not amount to a binding contract. ECF 20-1, at 12. The Court has rejected the argument that the Special Incentive plan clearly incorporated the terms of the Incentive Plan, particularly the latter's discretionary language, and thus does not address this portion of Defendant's argument.

to submit an approval request and that her complaint provides ample facts indicating that her

mangers, Biello and York, did indeed do so. ECF 21, at 17.

The Court agrees with Plaintiff. While Defendant argues in its reply brief that Plaintiff's

complaint does not indicate that she ever received approval from the requisite vice president, *see*

ECF 22, at 5, this is not entirely accurate. Rather, Plaintiff alleges sufficient facts to suggest that

she did receive such approval. *See* ECF 19, at 36 ¶ 209 ("Ms. Ward satisfied all of the requirements

for payment on the [JPMorgan] deal under the [Special Incentive plan], including **getting**

**approval by** and submitting all evidence to the VP of Worldwide Technical Services for payment

on the first $25 million of attainment.") (emphasis added); *see also id.* at 22 ¶¶ 158–64 (detailing

Plaintiff's efforts to ensure her managers sought and received approval for her to close the

JPMorgan deal). The Court is satisfied that Plaintiff has pleaded sufficient facts at this stage to

indicate that she did receive approval as required under the Special Incentive plan.

Accordingly, Plaintiff has stated a claim for breach of contract. She has sufficiently alleged

that Defendant owed her an obligation under the terms of the Special Incentive plan and that

Defendant failed to abide by that obligation, thus breaching its obligation. Count V of Plaintiff's

complaint survives.

### C. Count III – Unjust Enrichment; Count VII – Quantum Meruit

"Unjust enrichment and quantum meruit, both 'quasi-contract' causes of action, are

remedies to provide relief for a plaintiff when an enforceable contract does not exist but fairness

dictates that the plaintiff receive compensation for services provided." *Dunnaville v. McCormick*

*& Co., Inc.,* 21 F. Supp. 2d 527, 535 (D. Md. 1998). "These remedies are not available where a

contract exists, but 'parties may plead alternative theories of liability, indeed as many theories as

the facts will fit.'" *Havtech, LLC v. Allegheny Eng'g Co.*, Civ. No. GJH-18-1139, 2018 WL

6423893, at *3 (D. Md. Dec. 4, 2018) (quoting *Swedish Civil Aviation Admin. v. Project Mgmt.*

15

*Enters., Inc.*, 190 F. Supp. 2d 785, 792 (D. Md. 2002)).  Because Plaintiff's claims for unjust enrichment and quantum meruit involve similar considerations, the Court will consider them in the same section.

### 1.  Unjust enrichment under JPMorgan Contract

To state a claim for unjust enrichment (or quantum meruit), a plaintiff must establish "(1) that [they] conferred a benefit upon [defendant]; (2) that [defendant] knew of or appreciated the benefit; and (3) that [defendant's] acceptance or retention of the benefit under the circumstances is such that it would be inequitable to allow [defendant] to retain the benefit without the paying of value in return." *Int'l Waste Indus. Corp. v. Cape Env't. Mgmt., Inc.*, 988 F. Supp. 2d 542, 554 (D. Md. 2013), *aff'd*, 588 F. App'x. 213 (4th Cir. 2014) (citing *Benson v. State*, 887 A.2d 525, 547 (Md. 2005); *Smith v. Alacrity Servs., LLC*, 778 F. Supp. 2d 606, 610 (D. Md. 2011)).

Defendant disputes Plaintiff's ability to satisfy the third element because "it is hardly inequitable for IBM to act in accordance with the precise terms of the [Special Incentive plan]." ECF 20-1, at 10.  Because, Defendant contends, Plaintiff did not seek the requisite approval, Defendant was not "required to pay her any additional amount of commissions[.]" *Id.*  However, as the Court has already discussed, Plaintiff has indeed alleged that she sought and received such approval. *See* ECF 19, at 22 ¶¶ 158–64, 36 ¶ 209.  And the Fourth Circuit has repeatedly declined to dismiss claims for unjust enrichment in cases involving virtually equivalent circumstances. *See Martignetti*, 855 F. App'x at 861–62 (citing *Fessler v. Int'l Bus. Machs. Corp.*, 959 F.3d 146 (4th Cir. 2020)).  For example, in *Fessler*, the Fourth Circuit determined that a plaintiff could bring a claim for unjust enrichment against IBM where the plaintiff alleged that he was repeatedly told that he would receive a higher amount of commission than he actually did. *Fessler*, 959 F.3d at 157–58. *Martignetti* affirmed that claims of this kind survive dismissal.  855 F. App'x at 861–62 (adopting the *Fessler* and vacating the dismissal of claims for fraud, negligent misrepresentation,

and unjust enrichment). Plaintiff has made the same basic allegation here as the plaintiffs did in *Fessler* and *Martignetti*. *See* ECF 19, at 36 ¶¶ 209–14. As such, her unjust enrichment claim regarding the JPMorgan deal will not be dismissed.

### 2. Quantum meruit under the Special Incentive plan

As noted above, to state a claim for recovery under quantum meruit a plaintiff must allege:

(1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge by the defendant of the benefit; and (3) the acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value.

*Swedish Civil Aviation Admin.*, 190 F. Supp. 2d at 792–93. Defendant argues that Plaintiff's quantum meruit claim should be dismissed because Plaintiff "cannot establish that she had a reasonable expectation of payment of additional commissions" where she did not comply with the approval process. ECF 20-1, at 13. As discussed above, this argument is unpersuasive, as Plaintiff has in fact alleged the necessary compliance, and so the Court lets stand Plaintiff's quantum meruit claim related to the Special Incentive plan.

### D. Count IX – Promissory Estoppel Under the Special Incentive Plan

The final count at issue here is for promissory estoppel. In Maryland, there is no "independent cause of action labelled 'promissory estoppel'" but rather a lawsuit invoking promissory estoppel "remains that of an action to enforce a contract." *Suburban Hosp., Inc. v. Sampson*, 807 F. Supp. 31, 33 (D. Md. 1992). The elements of a promissory estoppel claim are:

1. [A] clear and definite promise; 2. where the promisor has a reasonable expectation that the offer will induce action or forbearance on the part of the promisee; 3. which does induce actual and reasonable action or forbearance by the promisee; and 4. causes a detriment which can only be avoided by the enforcement of the promise.

*Whiting-Turner Contracting Co. v. Liberty Mut. Ins. Co.*, 912 F. Supp. 2d 321, 343 (D. Md. 2012) (citing *Pavel Enters., Inc. v. A.S. Johnson Co.*, 674 A.2d 521, 532 (Md. 1996)).

17

Defendant argues that Plaintiff's promissory estoppel claim should be dismissed because she fails to make "any allegations that suggest that there was a clear and definite promise made by IBM to pay Plaintiff additional commissions under the [Special Incentive plan]." ECF 20-1, at 14. As the Court has noted above, this characterization does not acknowledge Plaintiff's explicit allegations that she was promised the requisite commission payment that she did not ultimately receive. *See* ECF 19, at 29 ¶ 197 ("Defendant promised Ms. Ward that, "If [she] closed [the deal], [she] would be compensated."); *id.* at 17 ¶ 124 (quoting the email announcement that stated "any eligible seller with a L25 sales plan who closes a deal with value greater than $25m will be paid for closing the full value of the deal . . . . If you close it, you will be compensated"). These allegations are sufficient to implicate a clear and definite promise at this stage in the litigation. Moreover, for the reasons articulated above, the Court finds unpersuasive Defendant's argument that the discretionary language of the Incentive Plan extended to the Special Incentive plan and therefore forestalled the possibility of making clear and definite promise. ECF 20-1, at 14. The Court will therefore decline to dismiss Plaintiff's promissory estoppel claim.

## IV.    CONCLUSION

For the foregoing reasons, Defendant's motion is DENIED.

A separate implementing Order will issue.

Dated: <u>March 27, 2025</u>                          _____/s/_____
                                                    Brendan A. Hurson
                                                    United States District Judge